**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SHEET METAL WORKERS'
INTERNATIONAL ASSOCIATION,

        Plaintiff,

vs.

UNITED TRANSPORTATION
UNION,

        Defendant.

Civil No. 07-2230 (JR)

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION TO TRANSFER**

Defendant United Transportation Union (UTU) moves to transfer this case to the Northern District of Ohio, arguing that this case involves the same issues as *Michael v. Futhey*, N.D. Ohio Case No. 1:07-CV-3818-JRA.

Defendant confuses the subject matter of the two cases. While both cases relate to a proposed merger between Plaintiff Sheet Metal Workers' International Association (SMWIA) and the UTU, they involve different controversies between different parties. *Michael* is statutory litigation between the UTU and four of its members over the validity of an <u>internal</u> UTU vote in August 2007. *Michael* involves a claim that the UTU did not

properly conduct a ratification vote on the merger under the Labor-Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. §§401 *et seq*.

This case involves a contractual dispute: the UTU's conduct toward the Sheet Metal Workers, under an Agreement regulating the parties' conduct both before and after a merger. The Agreement imposes a process and an obligation of good faith on both parties even before the merger itself has been finally ratified. The Merger Agreement is in effect and expressly provides for arbitration of disputes prior to the effective date of a merger. (Riley Decl. ¶2, Exh. A at 14, Article XII, third paragraph). Regardless of how the Ohio court rules in *Michael*, the UTU is still obliged under the Agreement to proceed in good faith in either 1) implementing the merger (if ratification is upheld) or 2) presenting the matter for a second membership vote.

The parties agreed that such disputes would be settled by an arbitrator appointed by the President of the AFL-CIO in the District of Columbia. They further agreed that the laws of the District of Columbia would govern the Agreement (Agreement p. 14, Article XII, first and fourth paragraphs). The SMWIA is headquartered in the District. The plaintiff's choice of forum is entitled to considerable deference, particularly where the parties expressly chose D.C. law as the governing law of the agreement. Both the private and public factors under 28 U.S.C. §1404(a) militate against transfer.

2

## STATEMENT OF FACTS

Plaintiff Sheet Metal Workers' International Association filed this action in this District Court on December 11, 2007. Plaintiff's suit asks for arbitral relief pursuant to the terms of a Merger Agreement entered into by the Sheet Metal Workers and the UTU in 2007.

### A.    The Merger Agreement

The Merger Agreement reflects an agreement between the two unions related to their potential merger into a single union, the International Union of Sheet Metal, Air, Rail and Transportation Workers, to be known by the acronym "SMART."

The Merger Agreement specifies numerous substantive agreements. First and foremost, it states that the leaders of the two unions recognize the benefits of a merger and have agreed to a process leading up to a merger "in an atmosphere of good will and respect" and that "these principles . . . have guided the parties in entering into this agreement." (Riley Decl., Exh. A at 2).

The Merger Agreement states that the Effective Date of the new union would be January 1, 2008.  It provides that the merger of the two unions shall be effective only upon approval by the Sheet Metal Workers' General Executive Council, the UTU's International Board of  Directors and the UTU's membership. If any of those three entities vote against the merger,

3

then the merger itself will be rejected and the Merger Agreement shall be deemed terminated.  (Riley Decl., Ex. A at 3).

The Merger Agreement contains a provision mandating the use of an arbitration procedure to resolve "any dispute or controversy arising out of or under this Agreement . . . ." (Merger Agreement, Article XII). The provision further states that arbitration "shall be the exclusive remedy" for any disputes, and that the arbitrator's decision "shall be final and conclusive." *Id.* The arbitrator shall be selected by the President of the AFL-CIO.  *Id.*

The Agreement contemplates arbitration of disputes arising both before and after the merger is effective:

> Each part will bear its own costs and will share equally in the fees and expenses of the arbitration, provided that if the arbitration proceeding occurs after the Effective Date, all costs shall be borne by SMART.

(Riley Decl., Exh. A, p. 14)

The Agreement also provides that "the laws of the District of Columbia shall be deemed to govern the interpretation and performance of this Agreement."  (Riley Decl., Exh. A, p. 14).

### B.    The Underlying Dispute

The Sheet Metal Workers' General Executive Committee, the UTU's International Board of Directors and the UTU's general membership each

ratified the Merger Agreement  (First Am. Compl., Doc. 6 at ¶¶17-18). The UTU's general membership voted in favor of the merger by the margin of 8,625 to 3,472 in a secret-ballot vote conducted by the American Arbitration Association in August 2007 (First Am. Compl., Doc. 6 at ¶19).

In December 2007 it appeared certain officers of the UTU were seeking to repudiate their duty to present the merger in good faith (First Am. Compl. Doc. 6 at ¶¶29-31).  The Sheet Metal Workers filed this action on December 11, 2007.[1]

The Sheet Metal Workers' lawsuit alleged prospective breaches of the Merger Agreement by UTU officials and requested arbitration.  Thereafter, the new President of the UTU and others have used the UTU's offices to denigrate the merger agreement to the UTU membership, acts for which the SMWIA seeks relief from the arbitrator.  (First Am. Compl., Doc. 6 at ¶33).

## C.    The *Michael* lawsuit

In early December 2007, four UTU members filed suit in the Southern District of Illinois.  *Michael et al. v. Thompson et al.*, No. 3:07-CV-00838-DRH-PMF (S.D. Ill.)  Named as defendants were the UTU and its then-

---

[1] At the time of filing this lawsuit in the District of Columbia, there was no "Ohio" case – the *Michael* case discussed below was pending in Illinois, not Ohio. Accordingly, the UTU is wrong to assert that "Plaintiff [Sheet Metal Workers] was fully apprised of the existence of the Ohio litigation prior to filing its Complaint ..." (UTU Brief, Doc. 7-4 at 4.)

president (Riley Decl., Exh. B). The *Michael* complaint challenged the validity of the UTU's August 2007 ratification vote, alleging the UTU's constitution required some additional procedures and that federal law required the UTU to give more information to its members before they voted.

The case was transferred to the Northern District of Ohio, because the LMRDA required venue in Ohio, and docketed as No. 07-cv-3818. The newly assigned judge in Ohio entered a TRO on December 27 preventing the UTU from giving effect to the membership ratification vote and merging, and subsequently approved two extensions of that TRO.[2]

**D.   Reasons for filing the case in the District of Columbia**

The Sheet Metal Workers filed its Complaint in the District of Columbia for multiple reasons:

*First*, the Merger Agreement specifies that it shall be interpreted according to the laws of the District of Columbia. Riley Decl., Exh. A at 14.

*Second*, the Merger Agreement states that the arbitrator shall be appointed by the President of the AFL-CIO, located in the District of Columbia. Riley Decl. ¶5.

---

[2] The online docket sheet shows a motion to stay that injunction, for lack of subject-matter jurisdiction, and then an interlocutory appeal to the Court of Appeals for the Sixth Circuit. The Sixth Circuit's online docket sheet shows the appeal has been docketed as Case No. 08-3156 (with a pending motion to stay the injunction, along with a motion to dismiss), and also that a petition for a writ of mandamus was filed, docketed as 6th Cir. Case No. 08-3160.

6

*Third*, the headquarters office of the Sheet Metal Workers is located in the District of Columbia.  First Am. Compl., Doc. 6, ¶7, admitted in Answer.

*Fourth*, the witnesses and evidence the Sheet Metal Workers will use to litigate this case are located at its headquarters office in the District of Columbia. Riley Decl. ¶10.

*Fifth*, the Merger Agreement was negotiated largely in the District of Columbia, where the UTU itself also maintains an office.  *See* Riley Decl. ¶11; First Am. Compl., Doc. 6, ¶8, admitted in Answer, Doc. 12, ¶8.

## ARGUMENT

### I.    This Case Does Not Concern the Same Issues as *Michael*.

Before we analyze the general private and public factors governing transfer under 28 U.S.C. §1404(a), we discuss the primary ground Defendant raises – the *Michael* litigation in Ohio between the UTU and four of its members.  Defendant argues that any matter related to the proposed merger is necessarily part of that LMRDA lawsuit. This argument lacks merit.

#### A.    Parties in a Labor Election May Contract to Regulate Each Others' Conduct, Separate from Any Statutory Jurisdiction over the Election Itself.

Plaintiff Sheet Metal Workers does not question the Ohio court's LMRDA jurisdiction over the UTU membership's August 2007 vote.  Nor does the SMWIA ask for an arbitrator to decide any issue about the August 2007

internal UTU vote.

But this statutory jurisdiction does not swallow up the UTU's contractual obligation to the SMWIA to proceed in good faith. This obligation attaches no matter how the *Michael* court rules. Even if the August 2007 vote is set aside, the UTU will <u>still</u> be under a contractual obligation to present the proposed merger in good faith in any rerun vote. This is not a statutory issue, and the LMRDA does not cover this contractual undertaking.

This issue comes up frequently where unions and employers agree to "good faith" or neutrality obligations during an election governed by labor law. While the National Labor Relations Board (NLRB) may have jurisdiction over the vote itself, and while the parties' arbitrator may have no power to contradict the NLRB election certification, the arbitrator may award remedies for a party's violation of the private "good faith" agreement. *See New York Health and Human Service Union 1199/SEIU v. NYU Hospitals Center*, 343 F.3d 117, 119-120 (2d Cir. 2003); *Service Employees Int'l Union v. St. Vincent Medical Center*, 344 F.3d 977, 985-986 (9th Cir. 2003). The *NYU Hospitals* and *St. Vincent Medical Center* courts rejected the argument that these contractual disputes were necessarily part of the NLRB's authority over the election itself. These courts upheld the separate power of an arbitrator to grant contractual remedies, even though the election itself was

subject to the NLRB's statutory jurisdiction.

This case is no different.  The SMWIA is asking for an arbitrator to resolve its claim that the UTU officers have violated the Agreement. First Amended Complaint, ¶¶31,33.  The relief sought from the arbitrator is not a ruling on the effectiveness of the August 2007 UTU membership vote, but a ruling that the UTU leadership must play fair going forward, however the LMRDA case is resolved.

### B.    The Statutory Issue in *Michael* Does Not Concern the Contractual Issue Here.

The *Michael* litigation is not concerned with the UTU's contractual obligations with the Sheet Metal Workers.  *Michael* focuses on an internal UTU matter: whether the August 2007 UTU ratification vote complied with union-election standards of the LMRDA.

Nothing in the LMRDA litigation accuses the Sheet Metal Workers of wrongdoing as to the UTU vote.  Nor does that litigation consider what duties the UTU and the SMWIA owe each other as a matter of contract, nor whether UTU officers have breached the Sheet Metal Workers/UTU agreement since August 2007.

While the LMRDA issue is clearly not arbitrable, the UTU's contractual duty to exercise good faith efforts (either to implement a duly ratified merger or to present the ratification fairly in any future rerun) is arbitrable.  The

9

arbitrator may not dictate how the UTU membership shall vote, nor rule on whether a given vote satisfies the LMRDA.  But the arbitrator may determine whether the UTU leadership has complied with its duty to exercise its best efforts, in good faith, in proceeding under the Agreement.  *Cf. Westinghouse Hanford Co. v. Hanford Atomic Metal Trades Council*, 940 F.2d 513, 519-523 (9th Cir. 1991) (arbitrator could resolve dispute over whether employer used its "best efforts" to obtain Davis-Bacon prevailing-wage certification, despite the arbitrator's lack of authority to overrule the Government's prevailing-wage certification itself).

"[T]he mere existence of a related case in another forum is insufficient grounds for transfer." *Sparshott v. Feld Entertainment, Inc.*, 89 F.Supp.2d 1, 4 (D.D.C. 2000), *citing Int'l Bhd. of Painters v. Best Painting*, 621 F.Supp. 906, 907 (D.D.C. 1985).  The fact that *Michael* and this case have a factual relationship to the proposed UTU/SMWIA merger does not counsel transfer, because the two cases involve different controversies between different parties and under different bodies of law.

## II.    DEFENDANT HAS NOT MET ITS BURDEN OF SHOWING THE NEED FOR TRANSFER.

On a motion to transfer under 28 U.S.C. §1404(a), the moving party has the burden of establishing that a transfer is proper.  *Air Line Pilots Ass'n v. Eastern Air Lines*, 672 F.Supp. 525, 526 (D.D.C. 1987).

As a threshold matter, the parties agree that jurisdiction would attach either here in the District or in the Northern District of Ohio, the respective headquarters of the SMWIA and the UTU. The UTU does not dispute this Court's jurisdiction (Answer, ¶¶5-6), and admits that it maintains an office in the District. Answer, ¶8, admitting ¶8 of First Amended Complaint.

The Court then turns to the private and public factors affecting transfer. *See Stewart Org. Inc. v. Ricoh Corp.,* 487 U.S. 22, 29-30 (1988)

### A.    Private Interests

"The private-interest considerations include: (1) the plaintiff's choice of forum, unless the balance of convenience is strongly in favor of the defendants; (2) the defendant's choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses, but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the ease of access to sources of proof." *Akiachak Native Community v. Dep't of the Interior,* 502 F.Supp.2d 64, 67 (D.D.C. 2007).

### 1.    Plaintiff's choice of forum in its home jurisdiction

"Unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Akiachak Native Community,* 502 F.Supp.2d at 67, *quoting Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508

11

(1947). "A plaintiff's choice of forum is entitled to significant weight and should not be disturbed absent a compelling showing." *Sparshott v. Feld Entertainment, Inc.*, 89 F.Supp.2d 1, 4 (D.D.C. 2000) (cit.om.). In the balancing, a "[p]laintiff's choice of forum is given paramount consideration and the burden of demonstrating that an action should be transferred is on the movant." *Air Line Pilots Ass'n,* 672 F.Supp. at 526 (cit.om.); *see also Scarborough v. Nat'l Ass'n of Surety Bond Producers*, 474 F.Supp.2d 64, 71 (D.D.C. 2007) (cit.om.).

This deference is particularly strong where the plaintiff chooses its home jurisdiction as its forum. *See Wada v. U.S. Secret Service*, 525 F.Supp.2d 1, 10 (D.D.C. 2007).

### 2.    The UTU's contractual choice of D.C. law

The UTU asserts, without evidence, that "the District of Columbia has no meaningful ties or interest in this suit, other than that the plaintiff's principal office is located in the District of Columbia." Deft. Memo. in Support of Transfer, Dkt. 7-4 at 5. This assertion defies reality.

The District of Columbia was not just the plaintiff's choice. This was the choice of the <u>parties</u> in agreeing to make the law of the District of Columbia the governing law of the agreement. *See* Agreement at p. 14, Article XII, fourth paragraph. "Under American law, contractual

choice-of-law provisions are usually honored." *Milanovich v. Costa Crociere, S.p.A.*, 954 F.2d 763, 767 (D.C.Cir. 1992) *citing* Restatement (Second) of Conflict of Laws § 187 (1971).

While a choice-of-law provision does not by itself <u>preclude</u> a forum other than this one, the parties' contractual choice of the law of the District of Columbia indicates both parties agreed to subject themselves to jurisdiction and possible litigation here. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 481 (1985) (holding that contract's choice-of-law provision militated in favor of jurisdiction in the forum state, since it "reinforced [the defendant's] deliberate affiliation with the forum State *and the reasonable foreseeability of possible litigation there*.") (emphasis added).

The parties' voluntary choice to apply the law of a given jurisdiction is thus an especially strong factor in deciding transfer motions. *Berenson v. Nat'l Financial Services*, 319 F.Supp.2d 1, 4-5 (D.D.C 2004); *Sheldon v. Nat'l RR Passenger Corp.*, 355 F.Supp.2d 174, 180-181 (D.D.C. 2005). The parties' choice of arbitration also counsels venue in the D.C. location of the President of the AFL-CIO, whom the parties designated to choose the arbitrator. *See Action Industries v. U.S. Fidelity & Guar. Co.*, 358 F.3d 337, 340 (5th Cir. 2004) (location of arbitration is entitled to weight in transfer).

### 3.    The contract was negotiated in D.C.

The third factor concerns where the claim arose. The claim in this case concerns solely a breach of contract, and that contract was bargained mostly here in the District of Columbia. Riley Decl., ¶11. Moreover, both parties maintain offices here in the District (Answer, Doc. 12, ¶8), and the District is where the newly created union would be based (Merger Agreement at pg. 4). Accordingly, this factor does not weigh in favor of transfer.

### 4.    Convenience of the parties and witnesses

The UTU argues that its witnesses and documents are in Ohio. But this does not tip the balance against Plaintiff's choice, because the Plaintiff's witnesses and documents are located here in the District (Riley Decl., ¶10).

The UTU does not claim that its witnesses and officers are not available for a hearing in D.C. Moreover, the SMWIA seeks here an order compelling arbitration, not a full-blown court litigation culminating in a trial on the merits in this Court. Ironically, the UTU _itself_ successfully opposed transfer of a suit to confirm an arbitration award in this District, on the ground that an arbitration case does not involve substantial litigation. *United Transportation Union v. Trailways, Inc.*, 1987 WL 8730 at *2 (D.D.C. 1987). Judge Greene agreed with the UTU that an arbitration case does not present the same issues of convenience as a judicial trial: "[G]iven the nature of this

14

case, it is quite likely that this dispute can be resolved as a matter of law, without the need to transport so much as one paper or one person." *Id.*

## C.    Public Factors

"The public-interest considerations include: (1) the [transferee court's] familiarity with the governing laws; (2) the relative congestion of the calendars of the potential transferee and the transferor courts; and (3) the local interest in deciding local controversies at home." *Akiachak Native Community*, 502 F.Supp.2d at 67.

As we discuss above, the governing law in this case is the law of the District of Columbia.  To the extent that federal labor law might figure in this case, the law would be the federal law of labor contracts under Section 301 of the Taft Hartley Act, 29 U.S.C. §185(a), not the LMRDA.  *United Ass'n of Journeymen and Apprentices v. Local 334, United Ass'n*, 452 U.S. 615, 619-20 (1982) (contract between unions governed by Section 301 of Taft Hartley); *see also, e.g., Vazquez v. Central States Joint Bd.,* 2006 WL 695563 *11, n.9 (N.D.Ill. 2006) (LMRDA does not govern litigation over arbitration of labor contracts).  There is therefore nothing at issue in the *Michael* litigation which would give the Ohio court any greater expertise in ordering arbitration than this Court would have.

## CONCLUSION

The Court should deny Defendant's Motion to Transfer.


Dated: March 25, 2008                    Respectfully submitted,



                                               .s/ Michael T. Anderson
Michael T. Anderson (No. 459617)
Arlus J. Stephens (No. 478938)
Davis, Cowell & Bowe LLP
1701 K Street NW, Suite 210
Washington, DC 20006
(202) 223-2620
(Fax) (202) 223-8651

Richard G. McCracken (CA No. 62058)
Paul L. More (CA No. 228589)
Davis Cowell & Bowe LLP
595 Market Street, Suite 1400
San Francisco, California 94105
(415) 597-7200
(Fax) (415) 597-7201

Attorneys for Plaintiff SHEET METAL
WORKERS' INTERNATIONAL
ASSOCIATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHEET METAL WORKERS'
INTERNATIONAL ASSOCIATION,

      Plaintiff,

vs.

UNITED TRANSPORTATION UNION,

      Defendant.

Civil No. 07-2230 (JR)

## DECLARATION OF PATRICK J. RILEY

I, Patrick J. Riley, hereby declare and state that I have personal knowledge of these facts and if called as a witness would competently testify as follows:

1.     I currently serve as Counsel for the Sheet Metal Workers' International Association (SMWIA) at its headquarters office, located in the District of Columbia.

2.     A true and correct copy of the signed Merger Agreement between the SMWIA and the UTU is attached.

3.     The Merger Agreement between the SMWIA and the UTU

contains a provision, at Article XII, mandating the use of arbitration to resolve "any dispute or controversy arising out of or under this Agreement ...." The provision further states that arbitration "shall be the exclusive remedy" for any disputes, and that the decision of the arbitrator "shall be final and conclusive."

4.    The Merger Agreement provides that "[t]he laws of the District of Columbia shall be deemed to govern the interpretation and performance of this Agreement."

5.    All arbitrations under the Merger Agreement are required to take place pursuant to directive of the President of the AFL-CIO, located in the District of Columbia.

6.    Attached is a copy of the complaint in the *Michael v. Thompson* case, as filed in the Southern District of Illinois, retrieved by means of that court's ECF system.

7.    When this lawsuit was filed, on December 11, 2007, the *Michael* lawsuit was pending in Illinois, not in Ohio.  The Illinois court subsequently transferred that case to Ohio, but only after the preparation of, and filing of, the complaint in this case here in the District of Columbia.

8.    The online ECF docket sheet for the Northern District of Ohio, where the *Michael* case is now pending under Case No. 07-CV-3818, shows a

2

TRO entered on December 27, 2007, then two subsequent consent injunctions, and then a notice of appeal filed on February 5, 2008.

9.     The online ECF docket sheet for the Court of Appeals for the Sixth Circuit shows two entries arising from the *Michael* case, an appeal (Case No. 08-3156) and a petition for writ of mandamus (Case No. 08-3160).

10.    The witnesses and exhibits the SMWIA will use in litigating this action are located in the District of Columbia.

11.    The Merger Agreement was negotiated by and between the SMWIA and the UTU over the course of two years.  Most of these meetings occurred in the District of Columbia.

I declare under the penalty of perjury that the foregoing facts are true and correct to the best of my knowledge.

_3/14/07_
Date

_Patrick J Riley_
Patrick J. Riley

3

# MERGER AGREEMENT

Between

**SHEET METAL WORKERS INTERNATIONAL ASSOCIATION, AFL-CIO, CLC**

And

**UNITED TRANSPORTATION UNION, AFL-CIO, CLC**

# PREAMBLE

This Agreement is entered into by and between Sheet Metal Workers International Association, AFL-CIO, CLC (SMWIA) and the United Transportation Union, AFL-CIO, CLC (UTU).

In entering into this Agreement, UTU and SMWIA recognize that they share common objectives and purposes, including a mutual desire to improve the living and working conditions of their members and to represent them with respect to all terms and conditions of their employment and to promote the well-being of their members and their families.

The fundamental purpose of this agreement is to unite and strengthen the members of the UTU and the SMWIA for more effective bargaining with the employers and for more effective organizing in the affected industries.

The officers of both organizations have met and negotiated this agreement in an atmosphere of good will and respect, with the firm conviction that combining the two organizations' members and their respective resources will enable the union more effectively to secure for its members continued substantial progress in their quest for a better standard of living. Each organization recognizes the contribution of the other to the welfare of the workers each is proud to represent. Above all, they know that unity between the two organizations will bring fresh strength to the affected industries. It will allow greater effort and resources to be directed toward the essential tasks of improving the wages, hours, working conditions, and security of all workers within the jurisdiction of the merged union. Unity of the two unions will also further gains in the areas of legislation, political action, human relations, and community affairs.

It is then these principles that have guided the parties in entering into this agreement.

## I. Agreement to Merge

SMWIA and UTU, on their own behalf and on behalf of their affiliates, hereby enter into this agreement to merge their separate organizations into a consolidated labor organization to be known as the International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART"), under the terms and conditions of this Merger Agreement and of the Constitution of SMART, which includes the current UTU Constitution in conformity with the SMWIA Constitution as Article 21B. As used herein, "affiliate" means a local union or council affiliated with SMWIA or a subordinate body of UTU. The UTU Insurance Association is not an affiliate within the meaning of this Agreement and shall remain a separate, independent organization and shall not be a part of SMART.

## II. Effective Date

Upon approval of this Merger Agreement and of the SMART Constitution (together the "Merger Documents") by the General Executive Council of SMWIA and the Board of Directors of UTU, and by the membership of UTU prior to its regular convention to be held in August 2007, and upon certification of those results by the respective International General Secretary-Treasurers, the merger of SMWIA and UTU to form SMART shall be effective. SMART shall be created as an unincorporated association under the laws of the District of Columbia, effective January 1, 2008, which shall be the effective date of the merger and is hereafter referred to as the "Effective Date." If either SMWIA or UTU fails to approve the Merger Documents by the procedures stated above, they shall be deemed terminated and of no force and effect.

### III. The Constitution and the Merger Agreement

SMART shall be governed by the SMART Constitution, which shall be the SMWIA Constitution amended to implement the provisions of this Agreement. This Merger Agreement is intended only to serve as a mechanism for integration of the two organizations and as a foundation for that Constitution. In the event of a conflict between any provision of this Merger Agreement and any provision of the SMART Constitution, the latter shall govern, and if any dispute should arise that cannot be resolved by the General President of SMWIA (and SMART) and the International President of UTU (SMART President, Transportation Division), it shall be referred to arbitration as provided in Article XII. The Merger Agreement shall expire and have no further legal force and effect on September 1, 2011 or when three-fourths of the SMART General Executive Council vote to terminate it, whichever date occurs sooner, unless the SMART General Executive Council has voted to amend this provision in accordance with Article XIII of this Agreement, below.

### IV. Headquarters

A.  Commencing on June 1, 2010, the International Headquarters of SMART shall be located in Washington, D.C. or its vicinity. It shall thereafter be designated in accordance with the SMART Constitution.

B.  The General President of SMART shall determine what functions shall be located at the International Headquarters, and what functions shall be performed elsewhere, subject to the approval of the General Executive Council.

## V.  Officers and General Executive Council

SMART shall have a General President and a General Secretary-Treasurer.  It shall have 17 General Vice-Presidents of whom 6 will come from UTU including its International President, Assistant President, General Secretary and Treasurer, National Legislative Director and the two (2) senior Vice Presidents elected at the 2007 UTU Convention.  The position of Assistant President and General Secretary and Treasurer shall be subject to attrition, and after attrition of each as described in Article VII, the next senior Vice Presidents will become SMART General Vice Presidents.  The 17 General Vice Presidents shall constitute the SMART General Executive Council.

A Transportation Division will be created.  All full-time UTU Vice Presidents elected at the 2007 Convention will become International Representatives and Organizers of SMART with functions of current UTU officers.  The Division will be led by the UTU International President, whose title will be "President, Transportation Division."  Also, within this Division will be the Bus Department, Yardmasters Department and Airlines Department.  The SMART Rail and Shipyard Department and Transportation Division will negotiate national rail contracts together when applicable.

After the Effective Date, the UTU positions referred to hereinabove shall be filled by election in the manner prescribed in Section VI of this Agreement below, but only those members who hold active transportation seniority with a rail carrier, bus line or air line will be eligible to be nominated for any of these positions.  If any of the original incumbents in these positions resigns, retires or dies before completing the term of office, the vacancy shall be filled from among the

other officers elected at the final UTU convention in 2007, in accordance with the UTU Constitution. The General President, General Secretary-Treasurer and the remaining 11 General Vice-Presidents shall be the SMWIA officers holding these positions immediately before the Effective Date. After the Effective Date, these positions shall be filled by election in the manner prescribed in the SMART Constitution.

## VI.  Transportation Division Convention

The Transportation Division shall hold its first convention immediately before the first SMART general convention in 2011. The delegates to the Transportation Division convention from local unions affiliated with the Transportation Division shall be the delegates to the SMART General convention. The Transportation Division convention shall by secret ballot elect officers for the positions listed in Article 21B of the SMART Constitution, as set forth in Article I. The Transportation Division convention may also recommend amendments to the SMART Constitution or recommend resolutions affecting members of the Transportation Division or of SMART generally, which shall be forwarded to the Constitution and Resolutions Committees, respectively, of the SMART general convention. The delegates to the Transportation Division convention may take up any other items of interest to the members of the Transportation Division, including education and legislative matters.

## VII.  Local Unions, Joint Boards and Other Chartered Bodies

Each chartered body of either SMWIA or UTU shall retain its charter as of the date of its original issue and become, by virtue of the merger, a chartered body of SMART. Should the charter numbers of local unions in SMART and UTU be the same, the Presidents may assign additional

identification to avoid confusion. The Presidents shall issue new charters to all SMWIA and UTU chartered bodies which will contain the date of their original chartering by SMWIA or UTU or their predecessor bodies. All future charters shall be issued in the name and authority of SMART.

The by-laws of the affiliates of SMWIA and UTU shall remain in full force and effect and, for a period of two years from the Effective Date, except to the extent that they conflict directly with the SMART Constitution. Under the supervision of the General President, all affiliates shall bring their by-laws into compliance with the SMART Constitution within two years of the Effective Date.

Current officers of the affiliates of SMWIA and UTU shall, upon the effective date of the merger, continue to serve in their elected capacities. The UTU's Assistant President, Secretary-Treasurer and 9th and 10th Vice Presidents as currently provided for in the existing UTU Constitution will attrite by the end of their term (2011).

After the Effective Date, all financial obligations of chartered bodies owed to SMWIA or to UTU shall be obligations of the chartered bodies owed to SMART.

## VIII.  Employees and Employee Benefits

No former SMWIA or former UTU employee who is employed by SMART shall experience any reduction in salary or allowances as a result of the merger. All former SMWIA or former UTU employees who are employed by SMART shall be credited with their service for SMWIA or UTU for all vacation and benefit purposes. Subject to approval of the appropriate unions for

union-represented SMWIA or former UTU employees, all former UTU employees with at least three years of service who desire to be employed by SMART after the discontinuance of UTU headquarters operations in Cleveland as of June 1, 2010 shall be permitted to transfer to the SMART International Headquarters for service in any vacancies for which they are qualified and shall have their service with UTU credited for seniority purposes. These employees shall be reimbursed for reasonable relocation expenses.

All persons employed by SMWIA or UTU prior to the Effective Date shall continue to be covered by the current staff benefit programs of their respective Unions, such as pension, health insurance and life insurance. All of the existing benefit programs for staff will continue. Under the supervision of the General President and the President, Transportation Division, former employees of UTU who continue employment with SMART shall become participants in the benefit plans that were sponsored by SMWIA by no later than January 1, 2011 and employee benefit plans sponsored by UTU shall be terminated or, in the case of the pension plan, benefit accrual shall be frozen, as of that same date. All such former UTU employees shall at that same date become vested immediately in the pension benefits they accrue under the SMWIA-sponsored pension plans and shall have no waiting period for eligibility for benefits under the SMWIA-sponsored health plan. Nothing in this Agreement shall be construed as a legal requirement for continuation of any benefit program for any period of time after the Effective Date, except where such legal obligation already exists.

Six of the officers elected at the final UTU Convention in 2007 will become General Vice-Presidents as provided in Article V of this Agreement. The International President, Assistant

President, General Secretary and Treasurer and National Legislative Director of UTUIA will be paid by UTUIA with respect to work allocable to UTUIA. SMART shall consider employment of former employees of UTU, provided that they accept employment at the International Headquarters on terms and conditions substantially equal to or better than the average economic package enjoyed by them from the date of this Agreement until immediately before the Effective Date. These employees shall be reimbursed for reasonable relocation expenses.

## IX. Membership

All members of SMWIA and UTU shall be members of SMART upon the Effective Date. Wherever the enjoyment of any right or privilege is based on length of membership in SMART, previous membership in SMWIA or UTU shall be deemed membership in SMART. Members of SMWIA or UTU shall be deemed members of SMART without payment of any initiation or other membership fee, except membership obligations due and unpaid to either SMWIA or UTU upon the Effective Date.

All financial obligations of members of SMWIA or UTU for any period prior to the merger shall be payable on the basis of the applicable provisions of the Constitutions of the respective Unions and the constitutions and bylaws of the subordinate bodies of the respective Unions then in effect.

Membership dues to SMART shall be assessed in accordance with the SMART Constitution. The International portion of dues paid to SMART by former SMWIA affiliates shall be in accordance with the former SMWIA Constitution. The International portion of dues paid to SMART by former UTU affiliates (subordinate bodies) shall be the same as the financial

obligations due to UTU International Union from its members under the former UTU Constitution, subject to Article XII.


## X. Property

On the Effective Date, all the property, real, personal and mixed, and all right, title, and interest, either legal or beneficial, in any monies, funds, or property, tangible and intangible, of SMWIA and UTU, including, but not limited to, their respective separate names, trademarks, copyrights, labels, registrations, emblems, union shop cards, all claims and debts, known or unknown, now due or accruing in the future to each of them, all the rights, privileges and powers, and every other interest of each of them, of whatever kind or nature whatsoever shall, by virtue of the merger of SMWIA and UTU, be transferred to and vested in SMART. Title to any property, real, personal or mixed, legally or beneficially vested by deed or otherwise in SMWIA or UTU shall not be impaired by reason of the merger but shall in all respects be vested in SMART by virtue of the merger. SMART shall, on and after the effective date of the merger, assume and be responsible for all the debts, liabilities, contract obligations, and other obligations of SMWIA and/or UTU. The debts, liabilities, contractual and other obligations assumed hereunder shall, on the effective date of the merger, attach to SMART to the same extent as if the said debts, liabilities, contractual and other obligations were its original undertakings.


The General President and his designees are hereby empowered to take all necessary legal steps on behalf of SMART to amend or change all deeds, bonds, mortgages, titles, certificates, leases, contracts or agreements or other indicia of ownership or legal right or obligation in order to reflect the merger and the transfer of ownership and rights and obligations to SMART. The

Presidents and their designees are further empowered on behalf of SMART to notify all legal entities, government agencies and other forums of the merger and transfer of ownership, rights, obligations and functions to SMART.

It is agreed and understood that in the discussions leading to this merger, both SMWIA and UTU submitted for the other's review a full and complete schedule of assets and liabilities (both actual and contingent). Both SMWIA and UTU waive any claim or potential claim against the other for fraud, duress or concealment.

Upon the Effective Date, the General Funds of SMWIA and UTU shall be merged and shall become the General Funds of SMART. Upon the Effective Date, the Strike and Defense Funds of SMWIA and of UTU shall be merged and shall become the SMART Strike and Defense Fund. Further, any and all other designated funds held as part of the general treasuries of either SMWIA or UTU, except those as to which legal restrictions prevent their unencumbered transfer, shall become part of the general treasury of SMART.

## XI. Rights and Obligations

The separate constitutions of SMWIA and UTU shall continue in effect after the Effective Date for the limited purpose of completing the merger and fulfilling the undertakings of this Merger Agreement and the SMART Constitution. Article 21 of the SMWIA Constitution will become Article 21A of the SMART Constitution. The UTU Constitution will become Article 21B of the SMART Constitution to the extent not in conflict with the current SMWIA Constitution or the terms of this Agreement. To the extent necessary to implement this Merger Agreement, the

General Executive Council of SMWIA and the Board of Directors of UTU shall be deemed to remain in existence, and during such time the officers of each Union shall retain the power, right, privilege, and authority incidental and necessary to carry out this Merger Agreement, including, but not limited to, the power to deal with the property or assets of each such Union, and they shall be authorized and empowered to execute and deliver or cause to be executed and delivered, any necessary deed, document, or other instrument.

Nothing in this Merger Agreement or in the SMART Constitution shall affect the rights of SMWIA or UTU's chartered bodies in and to their respective assets and rights of representation.

SMART shall be deemed to be a consolidation of SMWIA and UTU.  The merger of SMWIA and UTU shall not affect, interrupt, or change in any way the continuing status, or the rights or duties with respect to third persons, of either SMWIA or UTU or their affiliates.  It shall not impair the status of these organizations in any pending action or proceedings or any right, title, or interest in any property or arising from any deeds, bonds, mortgages, leases, or contracts or agreements of any kind whatsoever, including, but not limited to, recognition agreements and collective bargaining agreements or the continuity or renewal thereof.  Nor shall it impair any federal, state, provincial, territorial, or commonwealth certification or any representational rights or any other separate rights or obligations of such organizations under their existing collective bargaining agreements or checkoff authorizations.  All authority, power and rights, jurisdictional and otherwise, held by or vested in SMWIA and/or UTU under or in connection with any charter or affiliation with the AFL-CIO and CLC shall be automatically vested in SMART.

The merger of SMWIA and UTU is not intended to affect the existence, continuation, sponsorship, administration or any other aspect of the establishment or operation of any employee welfare or pension benefit plan for employees represented by either SMWIA or UTU or their respective affiliates.   As of the Effective Date, SMART shall be deemed the union sponsor of any such plan sponsored by either SMWIA or UTU as of the time immediately before the Effective Date.    SMART shall be vested with all powers under the respective trust agreements establishing the trusts holding the assets of such plans which were as of the time immediately before the Effective Date vested in either SMWIA or UTU.   All such powers shall be exercised by the General President.

## XII.  Arbitration

In the event of any dispute or controversy arising out of or under this Agreement, such dispute or controversy shall be referred to the SMWIA General President and the International President of the UTU (or, if the dispute or controversy arises after the Effective date, the SMART General President and the SMART President, Transportation Division for conference and resolution). If they are unable to resolve the dispute or controversy, it may be submitted by either officer, and no one else, to arbitration by an arbitrator appointed by the President of the AFL-CIO. The decision of such arbitrator on the disputed matter shall be final and conclusive on all parties and may be enforced in any court of competent jurisdiction.

The arbitrator's power shall be limited to the application and interpretation of this Agreement. The arbitrator shall have no power or authority to rescind, alter, amend, or modify any of the provisions of this Agreement.

Arbitration under this agreement shall be the exclusive remedy for any dispute hereunder, and the right to obtain such arbitration shall be a complete defense to any action at law or in court or in any other tribunal to enforce, modify, construe, or assert any right under this Agreement. The arbitrator shall have the power to require the attendance of any party to a dispute hereunder or of any witness whose testimony may be relevant to the arbitration of such dispute and to subpoena books, records, and other instruments relative to such dispute.

Each party will bear its own costs and will share equally the fees and expenses of the arbitration, provided that if the arbitration proceeding occurs after the Effective Date, all costs shall be borne by SMART.

The laws of the District of Columbia shall be deemed to govern the interpretation and performance of this Agreement.

## XIII.  Amendment Procedure

In recognition of the inability to anticipate all future developments, this Merger Agreement may be amended with the approval of the General President, the President, Transportation Division and a vote of seventy-five percent (75%) of the General Executive Council.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals this 8th day of August, 2007.


By: _Michael J. Sullivan_
     General President

By: _Paul C. Thompson_
     International President

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DALE EDWARD MICHAEL,       ) | |
|     6361 Jezek Road       ) | |
|     Salem, Illinois 62281, and       ) | |
|            ) | |
| JOHN R. HASENAUER, and       ) | |
| ROY G. ARNOLD, and       ) | |
| JIMMY D. EUBANKS,       ) | |
|            ) | |
|         *Plaintiffs,*       ) | Civil Action No. 3:07-cv-00838-DHR-PMF |
|   vs.       ) | |
|            ) | |
| PAUL THOMPSON, President, United       ) | |
|     Transportation Union,       ) | |
|     14600 Detroit Avenue,       ) | |
|     Cleveland, Ohio  44107, and       ) | |
|            ) | |
| UNITED TRANSPORTATION UNION,       ) | |
|            ) | |
|         *Defendants.*       ) | |

## COMPLAINT FOR DECLARATORY AND
## EMERGENCY INJUNCTIVE RELIEF

Introduction

1.  This action is brought under the Labor Management Reporting and Disclosure Act of

1959 ("LMRDA") by several rank and file union members to declare unlawful a referendum

conducted by their union to merge with another union, to declare the results null and void, and to

enjoin consummation of the merger on January 1, 2008, by virtue of the fact, *inter alia*, that the

membership was not furnished with crucial information with which to evaluate the implications

of the merger and were forced  to cast their ballots in an informational vacuum.

Jurisdiction and Venue

2.  The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367, and 29 U.S.C. §§ 185 and 412.  Pursuant to 29 U.S.C. § 412, venue is appropriate in any district court where a violation of the LMRDA occurred; in this case, the defendants conducted a national merger campaign and membership referendum, including within the Southern District of Illinois.

Parties

3.  Plaintiff Ed Michael is currently, and was at all material times, a member of the United Transportation Union.  He resides at 6361 Jezek Road, Salem, Illinois 62281.

4.  Plaintiff John Hasenauer is currently, and has been for the past 37 years, a member of the United Transportation Union, and the Secretary-Treasurer of UTU Local 286 for the past 25 years.

5.  Plaintiff Roy Arnold is currently, and has been since the early 1990's, a member of the United Transportation Union; he is currently an elected Vice President of the United Transportation Union in charge of its Bus Drivers Department and, as such, a member of the UTU's Board of Directors.

6.  Plaintiff Jim Eubanks is currently, and has been for the past 35 years, a member of the United Transportation Union and served as an elected officer of UTU Local 656 for 20 years.

7.  Defendant United Transportation Union (herein, "UTU" or "Union") is a labor organization within the meaning of 29 U.S.C. §§ 152(5) and 402(i).   Its headquarters are located at 14600 Detroit Avenue, Cleveland, Ohio 44107.

8.  Defendant Paul Thompson is currently, and was at all material times, the President of the UTU; he was responsible for the conduct of the merger referendum among the UTU

membership that is at issue herein.

Facts

9.  For the past three years, Defendant Thompson had been exploring possible merger opportunities with other unions.

10.  Defendant Thompson appointed  plaintiff Roy Arnold to serve on the Union's Merger Structure Committee whose responsibility was to negotiate the terms and conditions of any merger of the UTU with another union.

11.  On June 10, 2007, just prior to commencement of a gathering in Kansas City of approximately 750 UTU officials and staff, including most International Union officers and many Local officials, for the purpose of attending workshops and training seminars, UTU President Paul Thompson called a meeting of the UTU Board of Directors where he announced that he had entered into a Merger Agreement, dated May 17, 2007, with the Sheet Metal Workers International Association (herein, "SMWIA").

12.  This was the first notice that the UTU Vice-Presidents had that a merger with SMWIA was being seriously considered, much less that formal merger documents had been negotiated.

13.  Copies of the Merger Agreement were furnished to the UTU Vice-Presidents who were reassured by UTU President Thompson that the UTU's autonomy would not be compromised in any way, and that its Constitution would be retained "intact" as part of the constitution of a new union, created by the merger, to be known as SMART.

14.  Based upon those representations, the UTU Board of Directors voted to approve the Merger Agreement and to authorize Thompson to conduct a membership referendum.

-3-

15.  Article II of the Merger Agreement provides in part:

Upon approval of this Merger Agreement and of the SMART Constitution (together the "Merger Documents") by the General Executive Council of SMWIA and the Board of Directors of UTU, and by the membership of UTU prior to its regular convention to be held in August 2007, and upon certification of those results by the respective International General Secretary-Treasurers, the merger of SMWIA and the UTU to form SMART shall be effective.  SMART shall be created as an unincorporated association . . . effective January 1, 2008 . . ..  If either SMWIA or UTU fails to approve the Merger Documents by the procedures stated above, they shall be deemed terminated and of no force and effect."

16.  On July 17, 2007, the UTU caused the American Arbitration Association to send most of the UTU members an envelope containing (a) instructions for voting by telephone by August 7, 2007, using an assigned PIN number, (b) a copy of the Merger Agreement, (c) a 4-page letter from President Thompson exhorting members to vote YES, (d) a 1-page letter from AFL-CIO President John Sweeney endorsing the merger, (e) a "SMART Special Edition" tabloid containing statements and quotations from dozens of Union officials uniformly urging members to vote YES, and (f) an 11-minute DVD video disk with many officers of the UTU, as well as AFL-CIO Treasurer Trumka and SMWIA President Sullivan extolling the virtues of the merger. These materials assured members that their Union's autonomy would be preserved and their Constitution would be transferred "intact" into the SMART Constitution.

17.  Articles 23 and 91 of UTU Constitution, as construed and previously applied by the UTU leadership, requires that members be furnished with copies, by mail, of any agreements, settlements, or merger documents they are being asked to ratify in a referendum.

18.  In early July, the UTU promised in a website posting that "[m]aterials are being prepared to fully explain the proposed merger, which will accompany the ballot."

19.  Previously, in 2001, the UTU conducted a similar referendum to ratify a proposed

merger with the Brotherhood of Locomotive Engineers and furnished all members with copies of the proposed constitution that would have governed that union if the merger had been approved.

20. Although the UTU/SMWIA Merger Agreement specified that the SMART Constitution would have to be approved by the UTU membership before the merger could be effectuated, the ballot materials sent to the members on July 17th did not include a copy of the SMART Constitution.

21. To date, members have not been furnished with a copy of the SMART Constitution; on information and belief, that document does no yet exist in final form.

22. The UTU created a special "page" on its website on which it provided various "links," *inter alia,* to notices, press releases, statements by merger advocates, and a collection of Questions and Answers that were posted periodically during the course of the voting period (July 17th - August 7th), as well as a copy of the SMWIA's 133-page Constitution; however, at no time have the UTU members been furnished with printed copies of the SMWIA Constitution.

23. At no time prior to, or during, the merger referendum did the UTU provide its members with written notice, by mail, informing them that they could obtain access to the SMWIA Constitution and other information concerning the merger via the Internet, by logging on to the UTU website.

24. On information and belief, while a substantial percent of the UTU membership do own computers, a significant minority of the membership do not own computers. Moreover, among those members with computers, only a small fraction have signed up to receive email notices from the UTU and rarely if ever do the vast majority of members peruse the UTU website.

25.  Although Article XI of the Merger Agreement provides, *inter alia,* that the "UTU Constitution will become Article 21B of the SMART Constitution to the extent not in conflict with the current SMWIA Constitution or the terms of this Agreement," and although the Board of Directors as well as the entire UTU membership were repeatedly assured by President Thompson and his staff that there were no conflicts and that the UTU Constitution would remain "***intact***" following the merger, on information and belief, the Sheet Metal Workers have recently notified the UTU that dozens of provisions in its Constitution will have to be modified or eliminated to conform to the requirements of the SMWIA Constitution.

26.  Although President Thompson and his staff have portrayed the proposed merger of the UTU with the Sheet Metal Workers as a genuine merger of two unions to create an all new union to be known as SMART, in fact it would not be a *merger* in the traditional sense, but rather an *acquisition* of the UTU by the Sheet Metal Workers, a crucial, material fact that was withheld from the UTU membership who were bombarded by Thompson with pro-merger propaganda during what amounted to a rushed, quickie ratification referendum conducted without any meaningful discussion or debate among the UTU membership, most of whom knew nothing about the proposed merger until they received the Union's July 17th mailing, together with instructions to vote YES no later than August 7th.

27.  After the close of balloting, the American Arbitration Association issued a Certification of Results showing that a total of 12,097 votes had been cast: 8,625 FOR the merger, and 3,472 AGAINST the merger.

28.  According to the most recent LM-2 Report filed by the UTU with the U.S. Department of Labor pursuant to 29 U.S.C. § 432, there are 84,679 members in the UTU.

29. On information and belief, pursuant to Article II of the Merger Agreement, the UTU has certified the results of the referendum thereby activating the Agreement calling for consolidation of the two unions on January 1, 2008.

Exhaustion of Remedies

30. After receiving the Union's July 17th mailing, a significant number of members, including plaintiff Hasenauer, wrote to UTU President Thompson protesting the absence of the SMART Constitution from the mailing, and requesting that he furnish them with a copy of that document.

31. By letter dated August 3, 2007, President Thompson responded to plaintiff Hasenauer's protest, stating *inter alia*:

> There is no change to the UTU Constitution, as the SMWIA Constitution is amended by integrating the UTU Constitution intact as Article 21(b), which will serve as the SMART Constitution. It would have been cost prohibitive to print 80,000 SMART Constitutions to be mailed with the merger ballot . . .."

32. By letter dated November 7, 2007, plaintiff Arnold filed internal union charges against UTU President Thompson alleging a breach of fiduciary duty, *inter alia*, by virtue of his having "deceive[d] the UTU Board of Directors, subordinate officers, and the membership by misrepresenting and withholding the exact terms and conditions of a proposed merger," and by failing to provide the Board of Directors "with exact information regarding the adverse particulars of the proposed merger . . . [even though he] clearly understood that the autonomy of the UTU's international operations and subordinate structures would be devastated if the merger was approved," and by having "quash[ed] any possibility for open dissention and debate regarding the exact terms of the proposed merger . . . by proceeding immediately to cram the

-7-

proposed merger ratification process down the throats of the membership."  He requested the

UTU Executive Board to issue an immediate ruling declaring the referendum vote null and void.

By letter dated November 27, 2007, the Executive Board agreed to conduct a hearing on his

charges on December 13, 2007.  Whether and when that proceeding may be concluded, and what

action the Executive Board may take, is unknown: however, it may very well stretch  into 2008.

33.  Plaintiff Michael, after a series of unsuccessful attempts to obtain a copy of the

SMART Constitution, wrote to UTU President Thompson on October 12, 2007, and demanded

that he "set aside the recent vote . . . [because t]he balloting process was flawed and in violation

of the UTU/SMWIA Merger Agreement and your duty to provide the proper information which

would enable UTU members to make an informed vote on the proposed merger."  Further, he

requested Thompson to "reschedule a vote . . . which would be in compliance with" applicable

legal requirements.  To date, he has received no response to this letter.

34.  By letter to UTU President Thompson, dated November 3, 2007, Plaintiff Eubanks

demanded that immediate steps be taken to cancel the merger given that, *inter alia*, the members

had not been furnished with a copy of the SMART Constitution which they had been asked to

ratify, and the ratification referendum had not, accordingly, been "fair, [or] meaningful, and its

outcome [was] not reflective of an informed view of the UTU electorate or of those who actually

cast ballots."  To date, he has received no response to this letter.

First Cause of Action

35.  The foregoing allegations are incorporated herein.

36.  Article 23 of the UTU Constitution provides, *inter alia*: "The Board of Directors may

consider and implement plans of unification, affiliation, or merger with another labor union.  Any

-8-

such unification, affiliation, or merger shall be subject to convention approval or ratification by the membership of the United Transportation Union."

37.  Article 91 of the UTU Constitution sets forth the procedure that must be followed when obtaining ratification of collective bargaining agreements, a procedure that has also been followed by the Union in the past when seeking member approval of merger agreements.  That procedure requires the UTU first to circulate copies of proposed agreements to locals which then "have fifteen (15) days to submit questions" followed by discussion and debate among the affected members after which "Agreements shall be sent via first-class mail in an envelope marked "Important - Agreement and Ballot Enclosed" and the "[v]oting and tabulation of the results must be completed within twenty-one (21) days from the date the proposal is dispatched or presented by the International President."

38.  By failing to furnish members with copies of the SMART Constitution both prior to the conduct of the merger referendum, as well as in the first-class mail envelope that contained balloting instructions, the Defendants breached the contractual duties they owed to the UTU membership under both the UTU Constitution and the Merger Agreement in violation of 29 U.S.C. § 185.

39.  By proceeding to implement the merger between UTU and SMWIA without having first obtained approval of the SMART Constitution by the UTU's Board of Directors and membership, Defendants are breaching the Merger Agreement in violation of 29 U.S.C. § 185.

Second Cause of Action

40.  The foregoing allegations are incorporated herein.

41.  Defendants both misrepresented certain material facts concerning the proposed

merger of the UTU and SMWIA to, and withheld other material facts from, the Union's Board of Directors, subordinate officers, and members prior to, and during the course of, the merger referendum.

42.  UTU members were forced to vote in an informational vacuum as a consequence of which the referendum was neither fair nor democratic, and its outcome may not be said to reflect the members' informed political sentiments in violation of Title I of the LMRDA, 29 U.S.C. § 101(a)(1) and (2).

43.  Defendants rushed the referendum process so as to deprive members of their right to become informed, to discuss and debate the merits of the proposed merger, and to cast enlightened or informed ballots in violation of Title I of the LMRDA, 29 U.S.C. § 101(a)(1) and (2).

44.  By posting information relevant to the merger referendum on the UTU website without notifying all members in writing of its availability on the website, Defendants discriminated unlawfully against those members who do not own computers, or who are not Internet savvy, or who do not regularly peruse the UTU website, in violation of Title I of the LMRDA, 29 U.S.C. § 101(a)(1).

<u>PRAYER FOR RELIEF</u>

Wherefore, plaintiffs respectfully urge this Court to:

A.  Declare that the SMART Constitution has never been approved in accordance with the terms of the Merger Agreement and the requirements of the UTU Constitution, that Defendants violated the statutory and contractual rights of the UTU membership when conducting the 2007 merger referendum whose outcome is, accordingly, null and void;

B.  Enjoin Defendants from consummating the UTU's merger with the SMWIA on January 1, 2008;

C.  Enjoin the UTU from conducting future merger referenda without first having furnished its members with all material information that will enable them to inform themselves about, and to discuss and debate, not just the pro's, but also the con's associated with any proposed merger, and to cast informed ballots;

D.  Order the UTU to publish a copy of the Court's decision and order in a prominent location in the next issue of it membership newspaper, *UTU NEWS,* and promptly to post a copy on its website;

E.  Award plaintiffs such additional relief as may be just and proper, including their reasonable attorney fees and expenses.

Respectfully submitted,

s/Arthur L. Fox II

_____
Arthur L. Fox II
Lobel, Novins & Lamont
888 17th Street, NW, Ste 810
Washington, DC   20006
202-371-6626 (T) Extn 15
202-371-6643 (F)
Email: alfii@LNLLaw.com

*Attorney for Plaintiffs*

*Of Counsel:*

Barbara Harvey
1394 East Jefferson Avenue
Detroit, MI   48207
313-567-4228 (Tel & Fax)
blmharvey@sbcglobal.net