# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHEET METAL WORKERS'
INTERNATIONAL ASSOCIATION,

    Plaintiff,

      v.

UNITED TRANSPORTATION
UNION,

    Defendant.

Civil Action No. 07-2230 (JDB)

## MEMORANDUM OPINION

Before the Court is a motion by plaintiff Sheet Metal Workers International Association ("SMWIA") to compel arbitration of the claims in this case, which relate to an attempted merger between SMWIA and defendant United Transportation Union ("UTU"). UTU contends that no valid arbitration clause exists because the Merger Agreement that contains the arbitration provision either was never formed or has terminated. UTU also moves for leave to file several counterclaims against SMWIA arising from the disputed merger. Individual members of UTU move to intervene, raising statutory claims under the Labor Management Reporting and Disclosure Act ("LMRDA") that relate to their vote that ratified the Merger Agreement in 2007.

## BACKGROUND

### I.    Procedural History

The present conflict arises from an attempted merger between SMWIA and UTU in late 2007, which would create a new union, the International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART"). The parties and individual members of UTU have

filed several cases that relate to the disputed merger.  In Michael v. United Transp. Union, 2008

WL 2600002 (N.D. Ohio 2008), a district court granted injunctive relief to individual plaintiffs

who claimed that UTU violated their rights to an "equal vote" under Title I of the LMRDA by

not providing them sufficient information to vote on the merger.  The Sixth Circuit reversed and

the injunction was withdrawn and the case dismissed.  See Michael v. Futhey, 2009 WL 4981688

(6th Cir. 2009).  This case was stayed during the Michael litigation.  See Order dated April 3,

2008 [Docket Entry 15] at 1.[1]

        After the Michael litigation, SMWIA continues to urge that the current dispute regarding

the Merger Agreement should be sent to arbitration, and UTU maintains that the Merger

Agreement is invalid and no obligation to arbitrate exists.  UTU has moved for leave to file an

amended answer and counterclaims.  See Defendant's Counterclaims and Amended Answer

("Def.'s Answer") [Docket Entry 22].  SMWIA does not oppose this motion, but contends that

the defenses and counterclaims UTU raises in its amended answer are "within the scope of the

arbitration clause of Article XII of the parties Merger Agreement." Plaintiff's Memorandum in

Opposition to UTU's Motion for Leave to File ("Pl.'s Opp'n to Mot. for Leave") [Docket Entry

25] at 1. Additionally, individual members of the UTU have sought leave to intervene in this

case, claiming violation of their LMRDA rights.  Motion by Certain Members of Defendant

UTU for Leave to Intervene ("Mot. to Intervene") [Docket Entry 32] at 8.  Individual UTU

members have also filed a separate case before this Court, Murphy v. Sheet Metal Workers Int'l

Ass'n, 10-cv-01194, which raises substantially the same issues as are raised by the proposed

---

[1] This case was reassigned on June 3, 2010 from Judge James Robertson to Judge John D. Bates.  See
Docket Entry 38.  The related case of Murphy, et al. v. Sheet Metal Workers Int'l Ass'n, et al., 10-cv-01194 (JDB),
which was filed on July 15, 2010, is also before Judge Bates.

intervenors.  SMWIA has moved, and UTU has consented, to consolidate <u>Murphy</u> with this case.  <u>See</u> Consent to Motion to Consolidate [Docket Entry 14] at 1.

## II.    Factual Background

Several of the details of the attempted merger remain in dispute between the parties.  But the sequence of events that gave rise to the parties' claims and the contractual provisions of the Merger Agreement are straightforward.  In May 2007, Paul Thompson, then President of UTU, and Michael Sullivan, the President of SMWIA, entered into a Merger Agreement, which set forth a process by which the two unions would ratify the proposed merger.  Am. Compl. ¶ 11.  On June 11, 2007, the UTU Board of Directors voted unanimously to approve the Merger Agreement.  <u>Id.</u> ¶ 17.  The Board also voted to submit the merger to a vote of UTU membership, as required by the Merger Agreement.  <u>Id.</u>  On June 13, 2007, the General Executive Counsel of SMWIA voted to approve the Merger Agreement.  <u>Id.</u> ¶ 18.  Between July 17, 2007, and August 7, 2007, UTU's membership voted on the proposed merger.  <u>Id.</u> ¶ 19.  UTU members voted using an automated telephone voting system administered by the American Arbitration Association.  Defendant's Opposition to SMWIA's Motion to Compel ("Def.'s Opp'n") [Docket Entry 33] at 9.  Members who called in to vote were asked: "Do you accept the proposed merger agreement?  Press 1 to accept the proposed merger agreement.  Press 2 to reject the proposed merger agreement." <u>Id.</u> Members were not asked to vote on the SMART Constitution.  <u>Id.</u>  UTU membership voted in favor of the "merger agreement," with a vote count of 8,625 for the merger and 3,472 against it.  Am. Compl. ¶ 19.  The American Arbitration Association certified the results on August 8, 2007.  <u>Id.</u>  The Merger Agreement stated that the effective date of the merger would be January 1, 2008.  Merger Agreement ("MA") [Docket Entry 1-1] at 3.

To prepare members for the vote, UTU mailed to the membership a copy of the Merger Agreement. See Defendant's Counterclaims and Amended Answer ("Def.'s Answer") [Docket Entry 22-1] ¶ 11. The version of the Merger Agreement sent to UTU membership contained empty signature lines for the Presidents of both unions and the Secretary-Treasurers of both unions. See Def.'s Opp'n at 10. The final, signed Merger Agreement, however, only contained signature lines for the Presidents. Id. The Merger Agreement states that "[t]he UTU Constitution will become Article 21A of the SMART Constitution to the extent not in conflict with the current SMWIA Constitution or the terms of this Agreement." MA at 11. UTU did not mail members a copy of the SMART Constitution -- or the SMWIA or UTU Constitutions (although both were available on the UTU website). See Def.'s Opp'n at 8.

UTU held its convention in August 2007 shortly after the vote on the merger. Am. Compl. ¶ 23. Malcolm B. Futhey, Jr. was elected to succeed Paul Thompson as President of UTU, and a number of other new UTU officers were also elected. Id. ¶¶ 23-25. Following the convention, and prior to the merger's effective date of January 1, 2008, internal dissent within UTU regarding the merger grew. See id. ¶¶ 26-27. Futhey, who would become President of UTU on January 1, 2008, sided with UTU members who argued that the merger should not go into effect. Id. ¶ 27. These dissenters assert that Thompson had misled the UTU Board and membership regarding potential conflicts between the SMWIA and UTU Constitutions. Id. ¶ 28. Also, they contend that UTU, under Thompson's leadership, improperly failed to provide a printed copy of the new SMART Constitution to UTU members when they voted on the merger. See Def.'s Opp'n at 8.

Article II of the Merger Agreement, titled "Effective Date," set forth a number of conditions before the proposed merger would take effect:

Upon approval of this Merger Agreement and of the SMART Constitution (together the "Merger Documents") by the General Executive Council of SMWIA and the Board of Directors of UTU, and by the membership of UTU prior to its regular convention to be held in August 2007, and upon certification of those results by the respective International General Secretary-Treasurers, the merger of SMWIA and UTU to form SMART shall be effective. SMART shall be created as an unincorporated association under the laws of the District of Columbia, effective January 1, 2008, which shall be the effective date of the merger and is hereafter referred to as the "Effective Date." If either SMWIA or UTU fails to approve the Merger Documents by the procedures stated above, they shall be deemed terminated and of no force and effect.

MA at 3. Article XII of the Merger Agreement contained an arbitration clause:

In the event of any dispute or controversy arising out of or under this Agreement, such dispute or controversy shall be referred to the SMWIA General President and the International President of UTU (or, if the dispute or controversy arises after the Effective date, the SMART General President and the SMART President, Transportation Division for conference and resolution). If they are unable to resolve the dispute or controversy, it may be submitted by either officer, and no one else, to arbitration by an arbitrator appointed by the President of the AFL-CIO. The decision of such arbitrator on the disputed matter shall be final and conclusive on all parties and may be enforced in any court of competent jurisdiction.

The arbitrator's power shall be limited to the application and interpretation of this Agreement. The arbitrator shall have no power or authority to rescind, alter, amend, or modify any of the provisions of this Agreement.

Arbitration under this agreement shall be the exclusive remedy for any dispute hereunder, and the right to obtain such arbitration shall be a complete defense to any action at law or in court or in any tribunal to enforce, modify, construe or assert any right under this Agreement. The arbitrator shall have the power to require the attendance of any party to a dispute hereunder or of any witness whose testimony may be relevant to the arbitration of such dispute and to subpoena books, records, and other instruments relative to such dispute.

Each party will bear its own cost and will share equally the fees and expenses of the arbitration, provided that if the arbitration proceeding occurs after the Effective Date, all costs shall be borne by SMART.

The laws of the District of Columbia shall be deemed to govern the interpretation and performance of this Agreement.

MA at 13-14.  The Merger Agreement also states in Article III that it "shall expire and have no further legal force and effect on September 1, 2011 or when three-fourths of the SMART General Executive Council vote to terminate it."  MA at 4.

After the proposed January 1, 2008 "effective date" of the merger, and following the legal developments of the <u>Michael</u> litigation, the parties have continued to dispute the obligations and duties of union officers as to UTU, SMWIA, and SMART.  Def.'s Answer at 14-15.  These disputes are the bases for claims under Title V of the LMRDA, which regulates the fiduciary duty of union officers to their respective union members.  <u>See</u> Mot. to Intervene at 13-15.  Ultimately, as both unions concede, these issues relate to whether the merger ever occurred, which could only happen if UTU and SMWIA entered into a Merger Agreement.  <u>See</u> Am. Compl. ¶ 4; Def.'s Answer at 14.

## STANDARD OF REVIEW

When considering "a motion to stay proceedings and/or compel arbitration, the appropriate standard of review for the district court is the same standard used in resolving summary judgment motions" pursuant to Federal Rule of Civil Procedure 56(a).  <u>Brown v. Dorsey & Whitney, LLP</u>, 267 F. Supp. 2d 61, 67 (D.D.C. 2003) (internal quotation marks omitted); <u>see also</u> <u>Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.</u>, 636 F.2d 51, 54 & n.9 (3d Cir. 1980).  Thus, it is appropriate to grant a motion to stay proceedings when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment (i.e., arbitration) bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  The

moving party may successfully support its motion by identifying those portions of "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of motion only), admissions, interrogatory answers, or other materials," which it believes demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1); see Celotex, 477 U.S. at 323.

In determining whether there exists a genuine dispute of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); see also Par-Knit Mills, Inc., 636 F.2d at 54 ("The district court, when considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate had been made between the parties, should give to the opposing party the benefit of all reasonable doubts and inferences that may arise."). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. Id. at 252. By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment. Celotex, 477 U.S. at 322. Moreover, "if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted). Summary judgment, then, is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

<u>**ANALYSIS**</u>

## I.    UTU's Amended Answer and Counterclaims

UTU has moved for leave to file an amended answer and counterclaims. Def.'s Answer [Docket Entry 22]. SMWIA does not oppose this motion, but contends that the defenses and counterclaims UTU raises in its amended answer are "within the scope of the arbitration clause of Article XII of the parties' Merger Agreement." Pl.'s Opp'n to Mot. for Leave at 1. This Court "freely give[s] leave" to amend a pleading "when justice so requires," Fed. R. Civ. P. 15(a), and will grant UTU leave to file its amended answer. UTU also contends that its counterclaims and defenses are not arbitrable. Def.'s Opp'n at 38. The counterclaims raised by UTU include: declaratory judgment that the Merger Agreement has been terminated; unlawful demand for dues owed to UTU; tortious interference with contract; and federal and common law trademark infringements and false description of the UTU logo and service mark. <u>See</u> Def.'s Answer at 15-21. The Court will discuss these issues further below.

## II.   SMWIA's Motion to Compel Arbitration

SMWIA invokes the Federal Arbitration Act ("FAA" or "Act"), 9 U.S.C. §§ 1-16 (2000), to request a stay of proceedings in this action pending arbitration of its claims. In passing the FAA, Congress sought "to place arbitration agreements upon the same footing as other contracts." <u>Gilmer v. Interstate/Johnson Lane Corp.</u>, 500 U.S. 20, 24 (1991). Accordingly, the FAA dictates that an agreement to arbitrate in any "contract evidencing a transaction involving commerce" is enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Act further provides that a district court, "upon being satisfied that the issue involved in [a] suit or proceeding is referable" to arbitration, "shall on

application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." Id. § 3.

Before this Court can be satisfied that the issues in this action are referable to arbitration, it must first consider UTU's challenges to the validity of the contract that contains the arbitration agreement. See, e.g., Stromberg Sheet Metal Works, Inc. v. Wash. Gas Energy Sys., Inc., 448 F. Supp. 2d 64, 68 (D.D.C. 2006). "An agreement to arbitrate is valid, irrevocable, and enforceable, as a matter of federal law, 'save upon such grounds as exist at law or in equity for the revocation of any contract.'" Perry v. Thomas, 482 U.S. 483, 492 n.9 (1987) (citation omitted) (quoting § 2). The Supreme Court has clarified that state law, either in statutory or common-law form, can operate to invalidate an arbitration agreement under § 2 so long as "that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 686-87 (1996) (quoting Perry, 482 U.S. at 492 n.9). Thus, arbitration agreements can be rendered unenforceable on the basis of "generally applicable contract defenses, such as fraud, duress, or unconscionability." Id. at 687. SMWIA contends that to the extent that state-law contract principles are relevant to UTU's challenges to the arbitration agreement, this Court should look to the law of the District of Columbia, Am. Compl. ¶ 12, and the Merger Agreement states that "the laws of the District of Columbia shall be deemed to govern the interpretation and performance of this Agreement," MA at 14. UTU maintains that the Merger Agreement is by its own terms "of no force and effect." Def.'s Answer ¶ 12.

The FAA creates a strong presumption in favor of enforcing arbitration agreements and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983); Shearson/Am.

Express, Inc. v. McMahon, 482 U.S. 220, 226-27 (1987) (requiring courts to "rigorously enforce agreements to arbitrate").  Nevertheless, parties cannot be forced into arbitration unless they have agreed to do so.  Granite Rock Co. v. Int'l Broth. of Teamsters, 130 S.Ct. 2847, 2858 (2010); AT & T Techs. Inc. v. Commc'ns Workers, 475 U.S. 643, 648 (1986) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.").  Moreover, the authority of arbitrators to resolve disputes is derived from the agreement of the parties to engage in arbitration. Equal Emp't Opportunity Comm'n v. Waffle House, Inc., 534 U.S. 279, 294 (2002). Because arbitration provisions are in essence a matter of contract between the parties, courts decide whether the parties are bound by a given arbitration clause. Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84 (2002) ("[A] gateway dispute about whether the parties are bound by a given arbitration clause raises a question of arbitrability for a court to decide.") (internal quotation omitted).  Thus, courts shall apply "the presumption favoring arbitration, in FAA and in labor cases, only where it reflects, and derives its legitimacy from, a judicial conclusion that arbitration of a particular dispute is what the parties intended because their express agreement to arbitrate was validly formed . . . [,] legally enforceable and best construed to encompass the dispute." Granite Rock, 130 S. Ct. at 2860-61.

As SMWIA does here, such questions of arbitrability are typically brought before the court pursuant to section 4 of the FAA, which permits a party to petition any United States district court which would otherwise have subject-matter jurisdiction "for an order directing that such arbitration proceed in the manner provided for in such agreement." See 9 U.S.C. § 4. When presented with a motion to compel arbitration, a district court must "determine the enforceability of the agreement [to arbitrate] and decide whether arbitration should be compelled." Nelson v.

Insignia/Esg, Inc., 215 F. Supp. 2d 143, 146 (D.D.C. 2002). To make such a determination, courts must engage in a two-part inquiry. Id. at 149-50. First, the court must decide whether the parties entered into a valid and enforceable arbitration agreement. Nur v. K.F.C. USA, Inc., 142 F. Supp. 2d 48, 50-51 (D.D.C. 2001). If so, the court must then determine whether the arbitration agreement encompasses the claims raised in the complaint. Id.

Here, for the reasons described below, this Court finds that SMWIA and UTU entered into the Merger Agreement, which contains a valid and enforceable arbitration agreement. The Merger Agreement's broad arbitration clause encompasses the dispute between the parties as to whether the Merger Agreement has terminated. Hence, the Court lacks authority to determine whether the Merger Agreement remains in effect, which is an issue properly before the arbitrator.

A. The Arbitration Agreement is Enforceable

SMWIA contends that this Court must compel arbitration under the arbitration clause of the Merger Agreement. Whether or not the preconditions to the effective date of the merger under Article II were satisfied, SMWIA asserts, the Merger Agreement is a binding document that requires under Article XII that the parties arbitrate "any dispute or controversy arising out of or under this Agreement." See Plaintiff's Motion to Compel Arbitration ("Mot. to Compel") [Docket Entry 26] at 2.

UTU contests the validity of the arbitration provision on several grounds. First, UTU argues that President Thompson lacked the authority to commit UTU to the Merger Agreement. Second, UTU contends that, by its very terms, the Merger Agreement is "terminated and of no force and effect" because certain prerequisites to the merger did not occur. Third, UTU asserts

11

that the Merger Agreement is invalid and unenforceable because Thompson, with the knowledge and acquiescence of SMWIA's President Sullivan, violated the LMRDA in securing approval of the Agreement by UTU's members. Finally, UTU argues that even if the arbitration clause is valid, it does not cover the disputes raised by UTU's affirmative defenses and counterclaims.

As a preliminary matter, this Court must ensure that it has the authority to resolve each of these issues. Certain challenges to an arbitration agreement must be referred to arbitration in the first instance. In Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440 (2006), the Court noted that "[c]hallenges to the validity of arbitration agreements . . . can be divided into two types." 546 U.S. at 444. The first type, which "challenges specifically the validity of the agreement to arbitrate," may be adjudicated by the district court. Id. But the FAA does not permit a district court to consider the second type, which consists of "challenges [to] the contract as a whole, either on a ground that directly affects the entire agreement (e.g., the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." Id.; see also Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404 (1967) ("[I]n passing upon a § 3 application for a stay while the parties arbitrate, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate.").

Although the Supreme Court in Buckeye Check Cashing confirmed that "a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator," 546 U.S. at 449 (emphasis added), it also noted that "[t]he issue of the contract's validity is different from the issue whether any agreement between the alleged obligor and obligee was ever concluded," id. at 444 n.1. And the Court further emphasized that its opinion "addresses only the former, and does not speak to the issue decided in cases . . . which hold that

it is for the courts to decide whether the alleged obligor ever signed the contract, whether the signor lacked authority to commit the alleged principal, and whether the signor lacked the mental capacity to assent." Id. (citations omitted). UTU's first challenge, that President Thompson lacked the authority to commit it to the Merger Agreement, clearly falls into the category of disputes carved out of Buckeye Check Cashing's broader holding and hence that are properly resolved by this Court -- i.e., disputes over whether a contract existed at all. UTU's second argument, that the Merger Agreement has terminated, is a closer issue under D.C. Circuit precedent.

1. President Thompson's Authority to Enter into the Merger Agreement.

UTU raises a number of concerns regarding former President Thompson's "authority" to bind UTU to the Merger Agreement. "[A]uthority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." Lewis v. Washington Metro. Area Transit Auth., 463 A.2d 666, 669 n.4 (D.C. 1983) (citing Restatement (Second) of Agency § 26 (1958)). UTU does not dispute that Thompson was President at the time he signed the Merger Agreement or claim that UTU's Constitution requires something more than the President's signature to bind the union. Def.'s Answer ¶ 9; Def's Opp'n at 10. Instead, UTU claims that "Thompson lacked the authority to commit UTU when he knew that the prerequisites to the agreement had not been satisfied and that he was only one of the two officers required to sign on behalf of UTU."[2] Def.'s Opp'n at 29-30.

_____

[2] The "prerequisites to the agreement" to which UTU refers are not clear. To the extent the "prerequisites" are the lack of the Secretary-Treasurers' signatures on the Merger Agreement, the Court addresses that issue below. To the extent that UTU argues that the Merger Agreement was "nullified . . . by its own terms," Def.'s Opp'n at 30, the Court concludes that this is an issue of contract termination, which the arbitrator, not the Court, has the authority to decide.

The draft of the Merger Agreement circulated to the membership had a signature line for the Secretary-Treasurers of both unions to sign. Def.'s Opp'n at 31. The final Merger Agreement, however, only had signature lines for the two union Presidents. Id. UTU does not identify any other flaw in the Merger Agreement that Thompson signed or point to any requirement in the UTU Constitution that would indicate that the President lacked authority to bind UTU to contracts absent the signature of the Secretary-Treasurer. In fact, the UTU Board of Directors explicitly "recognize[d] that the UTU Constitution grants authority to the UTU International President to set policy as it pertains to the UTU's execution of a merger with another union." Resolution of United Transportation Union Board of Directors on July 24, 2009 [Docket Entry 22-2] at 1. Nonetheless, UTU asserts "the facts of the record clearly demonstrate that two intended signatories failed or refused to sign the proposed Merger Agreement." Id. at 32. Therefore, UTU argues, the Court should not compel arbitration because it is not clear that UTU was bound to the Merger Agreement.

To support its argument that Thompson's signature alone does not indicate a valid contract, UTU cites Will-Drill Resources, Inc. v. Samson Resources Co., 352 F.3d 211 (5th Cir. 2003). There, a company offered to buy the mineral resources from a number of sellers, represented by a single sales agent, and the agent, but not all of the sellers, signed the Proposed Sale Agreement that contained an arbitration clause. Will-Drill Resources, 352 F.3d at 212. The company later decided to withdraw the sales agreement, arguing that the Proposed Sale Agreement was not legally binding absent the signature of each seller. Id. at 213. The Fifth Circuit vacated the district court's order granting the agent's motion to compel arbitration, ruling that courts should "refus[e] to order arbitration of disputes where one party claims that it is not bound by the arbitration agreement, either because it was not an original party to the agreement,

14

its signature was forged, or because the person signing on its behalf was acting outside the scope of his authority and thus the party is not bound by the signature." Id. at 216.

None of the reasons discussed in Will-Drill Resources to support a refusal to order arbitration apply here. The UTU President and Secretary-Treasurer are not distinct parties to the Merger Agreement, but representatives of the same "party" – UTU. Then-UTU President Thompson signed the Merger Agreement, and no one contends his signature was forged. Furthermore, UTU's claim that Thompson "was acting outside the scope of his authority and [UTU] is not bound by [his] signature" does not make sense under traditional agency principles. See Lewis, 463 A.2d at 672 ("The principal may ratify [an agent's] act expressly or impliedly, by conduct inconsistent with any other hypothesis."). Here, the Merger Agreement was actually ratified by both the UTU Board of Directors and the UTU membership prior to Thompson signing the Agreement on August 8, 2007. Def.'s Answer ¶¶ 17, 19. Hence, Thompson plainly possessed the authority to sign the Merger Agreement on behalf of UTU.[3]

To be sure, UTU now claims that Thompson misrepresented information to the UTU Board and membership to induce their approval of the Merger Agreement. Id. ¶¶ 16, 17. But approval of the Merger Agreement -- a condition for "the merger of SMWIA and UTU to form SMART" -- is not a condition for the formation of the Merger Agreement. See MA at 3. The FAA "does not permit the federal court to consider claims of fraud in the inducement of the

---

[3]Moreover, the July 24, 2009 Resolution of the UTU Board of Directors, which UTU included as Attachment A to its Motion for Leave to File an Amended Answer and Counterclaims [Docket Entry 22-2], states that "on or about June 13, 2007 a Merger Agreement was entered into between the Sheet Metal Workers International Association ("SMWIA") and United Transportation Union ("UTU"), which provided that the two unions would merge to form the International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART"), conditioned upon UTU membership ratification of the Merger Agreement, together with a SMART Constitution." Hence, UTU effectively concedes that the two unions "entered into" a Merger Agreement -- whether the requisite conditions for the merger occurred, of course, is a different issue that is not before this Court.

contract generally," <u>Buckeye Check Cashing</u>, 546 U.S. at 445, and courts certainly may not

consider claims of fraud in the inducement of contract terms and conditions other than the

arbitration clause.  Such a claim is for the arbitrator to decide.  <u>See id.</u>  This Court will not

permit UTU to recast a claim that Thompson misrepresented information in order to induce UTU

members to approve the Merger Agreement (an issue for the arbitrator) as a claim of lack of

authority to enter into the Merger Agreement (an issue for the Court) simply in order to avoid

arbitration.[4]  <u>See id.</u> at 444 n.1 & 445; <u>see</u> <u>also Granite Rock</u>, 130 S. Ct. at 2861 n.11 ("[I]t is not

the mere labeling of a dispute for contract law purposes that determines whether an issue is

arbitrable.").

## 2.  Whether the Merger Agreement Has Terminated

SMWIA contends that the Merger Agreement is a valid contract that remains in effect

until at least September 1, 2011.  <u>See</u> MA at 4.  UTU counters that conditions precedent to the

effectiveness of the Merger Agreement itself -- not just the merger -- were not fulfilled.  Def.'s

Answer ¶ 5. Thus, UTU argues, by its own terms the Merger Agreement was terminated when

certain conditions did not occur.  <u>Id.</u>  In <u>Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.</u>,

850 F.2d 756 (D.C. Cir 1988), the D.C. Circuit established a framework to evaluate whether

parties had agreed to arbitrate the duration of an arbitration clause.  "Mindful [] of the federal

---

[4] UTU also argues that Thompson lacked authority to bind UTU to the Merger Agreement by contending
(<u>against</u> <u>itself</u>) that UTU violated Title I of the LMRDA by failing to provide enough information for members to
have a "meaningful vote."  Assuming that UTU may raise this argument, it nonetheless does not challenge the
<u>authority</u> of Thompson to enter the Merger Agreement for the same reasons explained above.  Under the UTU
Constitution, the President has the authority to act "as may be necessary for the proper conduct of the affairs of the
organization and the accomplishment of its objectives."  UTU Constitution [Docket Entry 33-7] at Art. 16.
     UTU members contend under Title I of the LMRDA that members did not receive sufficient information
from UTU -- essentially, a copy of the SMART Constitution -- to have a meaningful vote on the actual merger.  The
parties do not dispute that UTU's Board and membership received the complete text of the Merger Agreement,
which explained the conditions precedent to the actual merger of UTU and SMWIA.  UTU repeatedly argues that --
under the very terms of the Merger Agreement -- the disputed merger did not take effect.  In so doing, UTU cannot
dispute the formation of the Merger Agreement itself.

policy in favor of arbitration," the court in <u>National Railroad</u> "nonetheless [sought] to determine what appears to be most consistent with the intent of the parties." <u>Id.</u> at 760-61.   The court observed that "parties have it within their power to specify the date and hour at which their obligation to arbitrate is to end, or to specify a clear condition subsequent, such as sending of notice, giving any party the right to terminate that obligation . . . . Where they have not, the court performs its office of interpretation when it infers that they intended for the arbitrator to resolve the ambiguity." <u>Id.</u> at 762.   The court explained that a broad arbitration clause indicates an intent to permit the arbitrator to decide issues of contract duration, but this "presumption in favor of arbitrating disputes over contract duration can be overcome by a clear showing that the parties intended for the underlying contract to expire, or separately agreed to terminate it, before the relevant dispute arose." <u>Id.</u> at 763.

The court in <u>National Railroad</u> explained that "[i]f the arbitration clause is a narrow one, covering only specified types of disputes . . . then [courts] must presume that the parties did not intend for disputes over contract duration to be referred to arbitration." <u>Id.</u> at 762.   In those cases, "the court will decide the question of duration unless the party seeking arbitration makes a clear showing that the contracting parties intended such disputes to be arbitrated." <u>Id.</u>  But, when "[f]aced with a somewhat broader arbitration clause, however, such as one providing generally (perhaps with certain specified exceptions) that disputes 'arising under' or 'concerning' the contract are to be arbitrated, [courts] will presume that disputes over the termination or expiration of the contract should be submitted to arbitration." <u>Id.</u>; <u>accord</u> <u>New England Cleaning Servs. v. Servs. Emp. Int'l Union</u>, 199 F.3d 537, 541 (1st Cir. 1999) ("Under a broad arbitration clause, i.e. one covering all types of disputes, 'all questions, including those regarding termination, will be properly consigned to an arbitrator.'") (internal citations omitted).

However, "even in cases involving very broad arbitration clauses, the presumption in favor of arbitrating disputes over contract duration can be overcome by a clear showing that the parties intended for the underlying contract to expire, or separately agreed to terminate it, before the relevant dispute arose." National Railroad, 850 F.2d at 762-63. For example, the presumption in favor of arbitrating disputes may be overcome "if a contract provides that 'all disputes between the parties shall be arbitrated,' but with equal clarity provides that it will expire on a date certain." Id. at 763. In that case, "any dispute over whether the contract actually expired or was extended by the parties must be decided by the court rather than by the arbitrator." Id. Or, "even if the contract contains no expiration date, if the party resisting arbitration makes a clear showing that the parties have agreed to terminate the agreement containing the arbitration clause (or even just the clause itself), then the court must decide the contract duration issue itself, rather than sending it to arbitration." Id.

Courts consider arbitration clauses to be "broad" if they apply to disputes "'arising under' or 'concerning' the contract." Id. at 762; see also Invista N. Am. S.à.r.l. v. Rhodia Polyamide Intermediates S.A.S., 503 F. Supp. 2d 195 (D.D.C. 2007) (ruling that claims were within scope of arbitration clause of confidentiality agreement which stated that "[a]ny dispute arising out of this Agreement shall be settled by arbitration," because "arising out of" phrase was subject to broad interpretation in light of federal policy in favor of arbitration); Wolff v. Westwood Mgmt., LLC, 503 F. Supp. 2d 274, 282 n.4 (D.D.C. 2007), aff'd, 558 F.3d 517 (D.C. Cir 2009) (citing cases); Meshel v. Ohev Sholom Talmud Torah, 869 A.2d 343, 362 (D.C. 2005) ("[L]anguage [] requiring the submission to a Beth Din of 'any claim' of a member against the congregation that cannot be resolved amicably [] is sufficiently broad and all-encompassing to include the underlying disagreements between the parties concerning the governing structure of

the congregation, the ownership of its property, and the fiduciary duties of its officers and directors.").

Here, the arbitration clause contains the provision that "any dispute or controversy arising out of or under this Agreement shall be referred to the SMWIA General President and International President of the UTU . . . [and] [i]f they are unable to resolve the dispute or controversy, it may be submitted by either officer, and no one else, to arbitration by an arbitrator appointed by the President of the AFL-CIO." MA at 13. This clause contains the explicitly broad phrase "arising out of or under" the Merger Agreement and applies to "any dispute or controversy." Hence, because the parties agreed to a broad arbitration clause, the court may "presume that disputes over the termination or expiration of the contract should be submitted to arbitration." See National Railroad, 850 F.2d at 762. UTU may overcome this presumption of arbitration, "erected by the broad arbitration clause in this case, that this dispute over contract duration should be submitted to arbitration: either (1) by demonstrating that the original contract contains an unambiguous expiration date; or (2) by making a clear showing that the contract was properly terminated before this dispute arose." See id. at 763.

The Merger Agreement contains in Article III the clear expiration date of September 1, 2011, see MA at 4, but this date does not help UTU. Instead, UTU contends that the "unambiguous expiration date" is contained in Article II, the provision that establishes the "effective date" of the merger. See MA at 4. UTU's argument that the Merger Agreement is of "no force and effect" proceeds as follows. The Merger Agreement sets forth a ratification process for the "Merger Documents" -- defined as "together the Merger Agreement and the SMART Constitution"; Article II of the Merger Agreement sets forth specific procedures for SMWIA and UTU to approve the "Merger Documents"; and Article II states that "[i]f either

SMWIA or UTU fails to approve the Merger Documents by the procedures stated above, they shall be deemed terminated and of no force and effect." Def.'s Opp'n at 6. Because UTU did not provide a SMART Constitution to UTU membership, UTU contends, it was thereby impossible for those members to approve the SMART Constitution. Id. Therefore, UTU asserts, the "Merger Documents" were not approved and the Merger Agreement is "of no force and effect."

UTU's argument ultimately does not overcome the presumption in favor of arbitrating disputes over contract duration. Article II of the Merger Agreement indicates that "the merger of SMWIA and UTU to form SMART shall be effective" upon the "approval of this Merger Agreement and of the SMART Constitution . . . by the General Executive Council of SMWIA and the Board of Directors of UTU, and by the membership of UTU prior to its regular convention to be held in August 2007, and upon certification of those results by the respective International General Secretary-Treasurers." MA at 3 (emphasis added). The effective date of the Merger Agreement itself is not necessarily contingent upon its approval through this process by a date certain. UTU's argument may raise questions about the effective date of the agreement, but it does not identify an "unambiguous expiration date" as required by National Railroad to overcome the presumption that the dispute over contract duration or termination should be submitted to arbitration. See also Virginia Carolina Tools, Inc. v. Int'l Tool Supply, Inc., 984 F.2d 113, 118 (4th Cir. 1993) (ruling that a provision in an option agreement with "an express termination date" of 60 days after execution of the option overcame the agreement's otherwise "broad, non-specific arbitration clause").

Moreover, UTU's argument does not make a "clear showing" that the Merger Agreement was "properly terminated before this dispute arose" by its own terms. See National Railroad, 850 F.2d at 763. UTU does not dispute that its Board of Directors and membership approved the

20

Merger Agreement, or that the American Arbitration Association certified the election results. Def.'s Opp'n at 17-18. Instead, UTU only disputes whether the Secretary-Treasurers certified the results of the UTU membership vote, a fact UTU previously conceded in the Michael litigation. See Plaintiff's Reply in Support of Motion to Compel ("Pl.'s Reply") [Docket Entry 35] at 5-6. And other provisions of the Merger Agreement, which state that "the Merger Agreement shall expire and have no legal force or effect on September 1, 2011," directly contradict UTU's argument. See MA at 4. Hence, UTU cannot make the necessary "clear showing" to overcome the presumption that the issue of contract duration or termination should be submitted to arbitration.

B.     Does the Arbitration Agreement Cover the Disputed Issues?

UTU also contends that the arbitration clause in the Merger Agreement is narrow, and does not cover all disputed issues between SMWIA and UTU. "[I]t is generally for the courts to decide whether an arbitration clause is broad enough to cover a particular dispute." National Railroad, 850 F.2d at 761. As described above, the arbitration clause here is explicitly broad, covering "any dispute or controversy arising out of or under this Agreement." MA at 13.

"[A broad] arbitration clause . . . encompasses all matters that touch upon the contract." Wolff, 558 F.3d at 519 (citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, 473 U.S. 614, 624 n.13 (1985)). In Wolff, the D.C. Circuit affirmed the district court's grant of defendant's motion to compel arbitration despite plaintiff's argument that the parties' real estate agreement had terminated. Id. There, the arbitration clause applied to "any dispute which may arise during construction and management of the office building complex," and covered all of plaintiff's claims based on fiduciary duty because "[t]he obligations at issue in this case could

only have arisen from the [disputed] Agreement." Id. at 519. Furthermore, "[a]n order to arbitrate [a] particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." Id. at 520 (quoting Air Line Pilots Ass'n v. Fed. Express Corp., 402 F.3d 1245, 1248 (D.C. Cir. 2005)). "The Arbitration Act itself establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Id. (quoting Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983)).

Here, the arbitration clause plainly covers UTU's defenses and counterclaims that challenge the merger as well as any ongoing tort and trademark disputes between the two unions. See Def.'s Answer at 19- 23. UTU's tort and trademark claims relate to obligations that depend on the status of the merger. Because "[t]he obligations at issue . . . could only have arisen from the [disputed] Agreement," Wolff, 558 F.3d at 519, all of UTU's claims and disputes can fairly be said to arise out of or under the Merger Agreement.

The arbitration provision of the Merger Agreement, however, limits the arbitrator's power "to the application and interpretation of this Agreement" and does not provide the arbitrator with the "authority to rescind, alter, amend, or modify any of the provisions of the Agreement." MA at 13. UTU contends that the arbitrator therefore cannot "apply external law" or "decide that no agreement was ever formed" because the arbitrator can only "appl[y] and interpret[]" the Merger Agreement." Def.'s Opp'n at 39. But UTU misinterprets the limitations on the arbitrator. Here, the reference to the "laws of the District of Columbia" confirms that the arbitrator has authority to consider and utilize external law when applying and interpreting the agreement. See Am.

Postal Workers Union v. U.S. Postal Service, 789 F.2d 1, 6 (D.C. Cir. 1986) (ruling that "a provision of the agreement specifying that the discharge of Postal Service employees must be 'consistent with applicable laws and regulations'" granted an arbitrator the authority to consider federal criminal law).

UTU contends that the Merger Agreement's "exclusion of rescission from the arbitrator's authority" requires the Court to rule on UTU's defenses and arguments about whether a Merger Agreement was ever formed. Def.'s Opp'n at 40. But approval of the Merger Agreement -- a condition for "the merger of SMWIA and UTU to form SMART" -- is not a condition for the formation of the Merger Agreement. See MA at 3. UTU concedes that "a Merger Agreement was entered into between [SMWIA] and [UTU]," see Resolution of the UTU Board of Directors, and disputes only whether the conditions precedent to the merger (and the continuing effectiveness of the Merger Agreement) have been satisfied. It is the role of the arbitrator, not the Court, to apply and interpret the terms and conditions of the Merger Agreement. UTU cannot simply label the dispute as one of contract formation and thereby avoid arbitration. See Granite Rock, 130 S. Ct. at 2861 n.11 (explaining that the "labeling of a dispute for contract law purposes" does not "determine[] whether an issue is arbitrable"). The arbitrator, in interpreting the Merger Agreement itself, has the authority to determine whether "the Merger Documents [were approved] by the [stated] procedures" or if "they shall be deemed terminated and of no force and effect." See MA at 3. The arbitration clause of the Merger Agreement does not limit the arbitrator's authority to deem the contract terminated -- the remedy sought by UTU.

**III.    LMDRA Claims**

Individual members of UTU have moved to intervene, raising statutory claims under the LMRDA that relate to their vote that ratified the Merger Agreement in 2007.  Mot. to Intervene at 8.  Three of the proposed intervenors have also filed a separate case before this Court, Murphy v. Sheet Metal Workers Int'l Ass'n, 10-cv-01194, which raises the same issues the proposed intervenors raise here.  SMWIA has moved, and UTU has consented, to consolidate  Murphy with this case.  See Consent to Motion to Consolidate [Docket Entry 14] at 1.  The Court will grant the motion to consolidate in a separate order in the Murphy case.

The Court will also grant the individual UTU members' motion to intervene.  The intervenors raise claims under Title I and Title V of the LMRDA, arguing that UTU members' votes on the merger were not meaningful under 29 U.S.C. § 411(a)(1) and that UTU members have no fiduciary obligations to SMWIA or SMART under § 501.  At a minimum, given the identical facts, timely motion, and related federal claims raised by the intervenors, permissive intervention is appropriate.  Fed. R. Civ. P. 24(a)2 ("[T]he court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact."); EEOC v. Nat'l Children's Ctr., Inc., 146 F.3d 1042, 1045 (D.C. Cir. 1998) .

The parties agree that the individual UTU members' LMRDA claims are not arbitrable, see Mot. to Intervene at 8, and an arbitrator generally cannot decide individual union members' statutory claims under the LMRDA, see 14 Penn Plaza v. Pyett, 129 S. Ct. 1456, 1474 (2009).  Those claims are, therefore, properly before this Court.  However, the Court declines to address the statutory issues at this time.  The arbitrator should first evaluate the parties' claims arising under the Merger Agreement, which may shed considerable light on the LMRDA claims.  See IBT/HERE Emp. Representatives' Council v. Gate Gourmet Div. Americas, 402 F. Supp. 2d

289, 292-93 (D.D.C. 2005) ("Because a ruling in the pending arbitration proceeding may moot the remaining claims in this case or obviate the need for further judicial intervention, the court grants the plaintiff's motion to hold this case in abeyance."); U.S. ex rel. Milestone Tarant, LLC v. Federal Ins. Co., 672 F. Supp. 2d 92, 100-01 (D.D.C. 2009) ("Where the issues are not 'referable to arbitration' [] the courts have discretionary power to stay civil proceedings pending the resolution of arbitration.").

"A trial court has broad discretion to stay all proceedings in an action pending the resolution of independent proceedings elsewhere." Gate Gourmet, 402 F. Supp. 2d at 292; Int'l Painters & Allied Trades Industry Pension Fund v. Painting Co., 569 F. Supp. 2d 113, 120-21 (D.D.C. 2008) (staying proceedings pending determination by another court of the "underlying contractual obligations" of the parties). "The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." Gate Gourmet, 402 F. Supp. 2d at 292 (quoting Air Line Pilots Ass'n v. Miller, 523 U.S. 866, 879 (1998). This Court may find it most "efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case." Id. (quoting Leyva v. Certified Grocers of Cal., Ltd., 593 F.2d 857, 863-64 (9th Cir.1979)). Hence, the Court will stay the intervenors' LMRDA claims pending arbitration of the disputed issues raised by SMWIA and UTU under the Merger Agreement.

Deference to the agreement of the parties and judicial efficiency both support this approach. The Merger Agreement's arbitration clause requires the arbitration of disputes arising out of or under the Agreement. Therefore, the arbitrator must decide the parties' disputes that arise from the Agreement, including whether the Merger Agreement remains in effect. If the

arbitrator decides that the Merger Agreement is no longer in effect, then this Court may not need to address individual UTU members' LMDRA claims under Title I; or, if the arbitrator decides otherwise, this Court may not need to address UTU members' LMDRA claims under Title V. The Supreme Court resolved a similar question of efficiency in <u>Buckeye Check Cashing</u> in favor of sending issues to arbitration:

> It is true . . . that the <u>Prima Paint</u> rule [of severability] permits a court to enforce an arbitration agreement in a contract that the arbitrator later finds to be void. But it is equally true that respondents' approach permits a court to deny effect to an arbitration provision in a contract that the court later finds to be perfectly enforceable. <u>Prima Paint</u> resolved this conundrum – and resolved it in favor of the separate enforceability of arbitration provisions.

<u>Buckeye Check Cashing</u>, 546 U.S. at 448-49. So too, here, this Court defers to the parties stated intent to arbitrate all issues "arising out of or under" their Merger Agreement. To the extent that the intervenors' statutory claims remain after an arbitrator addresses the contractual and related issues, the Court will evaluate them as necessary at that time.

## CONCLUSION

For the reasons explained above, the Court will grant SMWIA's motion to compel arbitration and stay the individual UTU members' claims under the LMRDA pending the completion of arbitration. A separate Order accompanies this Memorandum Opinion.

_____/s/_____
JOHN D. BATES
United States District Judge

Dated:   March 4, 2011